[No. B220198. Second Dist., Div. Eight. Dec. 10, 2012.]

SUMMIT MEDIA LLC, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant, Cross-defendant and Respondent;
CBS OUTDOOR INC. et al., Real Parties in Interest, Cross-complainants
and Appellants.

## COUNSEL

Perkins Coie, Timothy L. Alger; Quinn Emanuel Urquhart & Sullivan, Scott B. Kidman and Anthony P. Alden for Plaintiff and Appellant.

Andrews Lagasse Branch & Bell, Michael J. O'Connor, Jr., and Shauna L. Sinnott for The Westwood South of Santa Monica Blvd. Homeowners Association and The Westwood Homeowners Association as Amici Curiae on behalf of Plaintiff and Appellant.

Reed Smith, Margaret M. Grignon and James C. Martin for Real Party in Interest, Cross-complainant and Appellant Clear Channel Outdoor, Inc.

Kendall Brill & Klieger, Laura W. Brill, Joshua M. Rodin and Richard M. Simon for Real Party in Interest, Cross-complainant and Appellant CBS Outdoor, Inc.

Carmen A. Trutanich, City Attorney, Tayo A. Popoola and Steven N. Blau, Deputy City Attorneys, for Defendant, Cross-defendant and Respondent.

Sabine & Morrison and Randal R. Morrison for League of California Cities as Amicus Curiae.

OPINION

GRIMES, J.—

## SUMMARY

This is a dispute among several outdoor advertising companies and the City of Los Angeles over certain billboards with digital displays, and over the city's authority to settle with two of those companies on terms that permitted them to digitize many of their existing billboards, even though a municipal ordinance expressly prohibited "alterations or enlargements" of such signs. A third company filed this suit for a writ of mandate ordering the city to set aside the settlement agreement and withdraw all permits issued under it. The trial court found the settlement agreement was illegal and void, because it allowed the alteration of billboards in violation of municipal ordinances. But the trial court declined to revoke permits that had been issued pursuant to the agreement, concluding permit revocation was an administrative issue for determination on an individual basis.

We affirm the trial court's order finding the settlement agreement void, but conclude the court also must order revocation of all digital conversion permits granted under the illegal settlement agreement.

## FACTS

In August 2008, Summit Media LLC (plaintiff) sought a writ of mandate ordering defendant City of Los Angeles to set aside a settlement agreement between the city, on the one hand, and CBS Outdoor Inc. and Clear Channel Outdoor, Inc. (real parties in interest), on the other. Plaintiff and real parties are companies engaged in the outdoor advertising business in the city. All of them own and maintain numerous "off-site signs"—billboards in locations other than at a property owner's business. Plaintiff contended the city's entry into the settlement agreement with real parties (its competitors) was an invalid, illegal and ultra vires act, and that all permits and authorizations the city had issued pursuant to the settlement should be revoked.

The genesis of the contested settlement agreement, executed two years earlier, was litigation over city ordinances regulating offsite signs. In December 2000, the city council passed an ordinance imposing an interim prohibition on the issuance of permits for the construction or placement of new offsite signs. In April 2002, the city council amended the Los Angeles Municipal Code (LAMC or municipal code) to establish a permanent, general ban (with exceptions not relevant to this case) on new offsite signs throughout the city (the 2002 sign ban). The 2002 sign ban also applied to "alterations or enlargements of legally existing off-site signs." (L.A. Ord. No. 174547, § 2.11.)

Also, in February and July 2002, the city council passed two ordinances amending the municipal code to establish an offsite sign periodic inspection fee and an inspection program. The first ordinance established an offsite sign inspection program and an annual fee to pay for it (the inspection program), and the second ordinance set the amount of the annual inspection fee (the sign fee ordinance). The main components of the inspection program were that all offsite signs on private property were subject to annual inspection; an annual inspection fee (later set by ordinance at $314) was imposed on all offsite signs; upon payment of the fee and furnishing of the relevant building permit or equivalent documents, the city would issue an inspection certificate; and if the fee were not paid, or the city determined that a sign had not been lawfully erected, the sign would be removed. (LAMC, former §§ 91.6205.18.1–91.6205.18.9.)

■ Litigation over the inspection program and sign fee ordinance ensued, the complete history of which is unnecessary to recount here. On October 4, 2002, Vista Media Group, Inc. (hereafter Vista) (also in the outdoor advertising business), brought a reverse validation action (Code Civ. Proc., § 860 et seq.) in superior court. The Vista action sought a judicial declaration that the sign fee ordinance was invalid, on the grounds that it violated free speech, takings and due process constitutional provisions and the fee exceeded the reasonable cost of achieving its purported goal. We find it helpful at this point to briefly summarize what is a validation, or "reverse validation" action. The validation statutes permit a local government entity to obtain a judicial decision that a municipal or other local agency has acted legally in making a decision affecting real or personal property. A so-called reverse validation action seeks the opposite, a declaration that the act or omission of a local government is invalid and illegal. A validation, or reverse validation, action may be brought only if authorized by another statutory provision.

Vista's action was authorized under statutes that govern fees charged by local agencies for zoning variances, building permits and the like. (See Gov. Code, §§ 66014, subds. (a) & (c), 66022, subds. (a) & (b); Code Civ. Proc., § 860 et seq.) Real parties intervened in the Vista action and in December 2002 filed cross-complaints against the city, seeking to invalidate the sign fee ordinance and also seeking declaratory and injunctive relief preventing the city from enforcing the reporting requirements of the offsite sign inspection program.

Vista settled its lawsuit with the city in December 2004 and moved to have its settlement incorporated into a stipulated judgment. Real parties objected, contending the Vista settlement was "ultra vires and void," because the city was contracting away its police power by creating a reduced inspection fee schedule and enforcement program applying only to Vista, and the new fee

structure for Vista was established without public participation. The trial court (Judge Dau) eventually approved a revised stipulated judgment. (We do not address the city's settlement with Vista any further.) Then, on September 30, 2006, the city and real parties entered into a settlement agreement in the Vista action.

The city and real parties agreed to file a stipulated judgment dismissing real parties' claims. The stipulated judgment, expressly reciting the terms of the settlement agreement, was entered by Judge Dau on February 2, 2007. In April 2007, plaintiff sued the city in federal court. The district court declined to exercise jurisdiction, and in August 2008 plaintiff filed this lawsuit.

This lawsuit was initially assigned to Judge Chalfant, who issued a number of rulings that real parties challenge in this appeal, as discussed below. After Judge Chalfant recused himself from this case, it was reassigned to Judge Green. We now quote Judge Chalfant's description of the facts of this case, later found by Judge Green to be an accurate recital.

"The Settlement Agreement grants [real parties] exemption from the City's [2002 sign ban], the Off-Site Sign Inspection Program, and numerous other zoning and building laws regulating off-site signs in the City.

"The Settlement Agreement exempts [real parties] from the application of numerous zoning and building laws, including many provisions of the [2002 sign ban].[1] The Settlement Agreement allows [real parties] to maintain all of their pre-1986 off-site signs, whether or not lawfully erected, whether or not they have permits, whether or not they comply with their permits, and whether or not they violate present or prospective City building ordinances. . . .[2]

"The Settlement Agreement also requires the City to issue new permits to allow [real parties] to 'modernize' up to 840 of their post-1986 off-site signs—one quarter of their total inventory. The City has agreed to issue these permits despite the [2002 sign ban] for new offsite signs, and its strictly

---

[1] As stated above, the 2002 sign ban applied to "alterations or enlargements of legally existing off-site signs." Under the settlement agreement, however, real parties were "entitled to add to, convert, or rebuild their currently existing Structures to include (i) digital technology that allows static advertising copy to be changed remotely by electronic communications rather than by changing the advertising copy on site with poster sheets, or vinyl ('digital posting' also known as 'programmable electronic messages'); (ii) tri-vision Structures (*i.e.*, Structures with moving three-sides slats); (iii) horizontal or vertical back-lit 30 sheets; or (iv) an additional face on a single-faced Structure (collectively, 'Modernizations')."

[2] See, for example, section 6.A.i. of the settlement agreement, providing in part that "the City agrees to recognize the legality of all of [real parties'] Pre-1986 Structures and to issue permits for such Structures."

enforced ban on these very types of modification. The City has also agreed to issue these permits without regard to whether or not those 840 signs were lawfully erected, whether or not those 840 signs ever had permits, whether or not those 840 signs comply or have ever complied with a permit, and whether or not those 840 signs violate present or prospective City building and zoning ordinances.

"Additionally, the Settlement Agreement permits [real parties] to add 200 new off-site signs to their existing sign structures, known as 'back-up faces,' despite the City's general ban on all new off-site signs, including adding 'back-up faces,' by way of alteration or modification of an existing sign structure.

"The Settlement Agreement gives [real parties] a general exemption from the requirement to provide evidence that pre-1986 sign structures were lawfully erected, a direct violation of LAMC section 91.6205.18(3).[3] Off-site signs erected by [real parties] between 1986 and 1998 will be allowed to exist even if no permit was ever obtained or the signs were illegally modified. The Settlement Agreement gives [real parties] the right to maintain sign structures that are out of compliance with the original building permit, even though such alterations render the signs illegal and subject to abatement under LAMC section 91.6205.18(9).[4]

"The Settlement Agreement specifically identifies 10 separate City laws with which [real parties] need not comply in undertaking modernizations, including LAMC sections 12.21(A)(7)(*l*) (off-site sign ban), 12.21.1(A)(10) (height restrictions), 12.22(a)(23) (regulations in mini-shopping centers and commercial corners), 91.6205.18 (the Inspection Program), and LAMC § 91.6205.11(11) or any other ban on one or more categories of signage.[5]

---

[3] LAMC former section 91.6205.18.3 (the inspection program) governed inspection certificates, and stated in part that a certificate affirming that the offsite sign periodic inspection fee had been paid would be issued "upon payment of proper fees, and furnishing of the building permit number, or a copy of the building permit, or a statement signed under penalty of perjury setting forth the circumstances by which the sign was acquired and/or installed and/or the date of issuance of the building permit . . . ."

[4] LAMC former section 91.6205.18.9 (the inspection program) provided in part that if the city determined that an offsite sign was not lawfully erected "then the off-site sign shall have its sign face removed and replaced with blank panels."

[5] The settlement agreement states that, "[n]otwithstanding anything else in this Agreement or the Municipal Code, neither Clear Channel nor CBS will be denied a permit for any Modernization on any existing Structure, or restricted in the use of any Modernization, . . . based on the fact that any Structure to be modernized may otherwise fall within a prohibition or restriction in any of the following Ordinances, Code provisions, interpretations or memoranda . . . ." The settlement agreement then lists LAMC sections 12.21(A)7(*l*), 12.21.1(A)10, 12.22(A)23, former section 91.6205.11(11) "or any other ban on one or more categories of signage," and former section 91.6205.18, as well as the 2002 sign ban.

"[Real parties] are also exempted from the usual procedures for obtaining permits. Section 5(D)(ii) [of the settlement agreement] prescribes that, in the event the City cannot process [real parties'] permit applications within 30 days, the City is prohibited from processing any other 'building, demolition or relocation permits for any structure, including but not limited to signs' until it has cleared [real parties'] applications. Thus, no matter what the circumstances or exigencies, the applications of every other Los Angeles resident and property owner must be put on hold until those of [real parties] are approved."

As the trial court found, "[s]hortly after signing the Settlement Agreement, [real parties] began undertaking significant modifications of their existing signs, which are otherwise prohibited by the general ban on off-site signs. Clear Channel has already received City permits under the Settlement Agreement to convert over 40 off-site signs to digital displays. Because the cost to convert an existing static, wood and vinyl sign to an LED digital display exceeds 50 percent of the replacement cost of both the sign and sign support structure, such a conversion would not be a mere 'alteration repair or rehabilitation' within LAMC section 91.6216.4,[6] but would be either a violation of that section or a new sign subject to the general ban. [CBS Outdoor Inc.] has received numerous permits as well."

In December 2008, the city enacted an ordinance expressly preventing the issuance of building permits for offsite signs with digital displays. (L.A. Ord. No. 180445.) The ordinance imposed "interim regulations on the issuance of building permits for Off-Site Signs, including Digital Displays, and new Supergraphic Signs." The ordinance defined "digital display" and "super-graphic sign," and prohibited both the issuance of building permits and the alteration or construction of all offsite signs (including digital displays and supergraphic signs) "pursuant to a building permit issued prior to the effective date of this ordinance." (The ordinance included an exception if the building permit holder had already performed substantial work and incurred substantial liabilities in reliance on the permit.) The ordinance's "whereas" clauses referred to the city's settlements with real parties allowing them "to modernize a certain number of existing conventional signs to digital signs," and stated that "no existing City regulations address where and how these

---

[6] LAMC section 91.6216.4 provides in part that alterations, repairs or rehabilitation of existing sign and/or sign support structures in excess of 10 percent of the replacement cost of both the sign and sign support structure may be made, provided the cost does not exceed 50 percent of the replacement cost, there is no increase in sign area or height and no change in location or orientation of the sign, and "[a]ll new construction shall be as required for a new sign of the same type." (§ 91.6216.4.2.) Alterations, repairs or rehabilitation that exceed 50 percent of the replacement cost of both the sign and sign support structure "shall comply with all the requirements of this Code." (§ 91.6216.4.3.)

conversions can take place" and that the conversions were "causing unanticipated negative impacts including negative impacts on residential neighborhoods . . . ." Prohibitions explicitly banning offsite signs with digital displays became a part of the municipal code effective August 14, 2009. (LAMC, § 14.4.4(B)11.)

After multiple hearings, the trial court (Judge Green) granted plaintiff's motion for a writ of mandate, ordering the city to set aside and cease implementing the settlement agreement. The court ruled on each of the contentions we discuss in this opinion, and we affirm all of the rulings which led the court to conclude the settlement agreement was void for all purposes. The court, however, rejected plaintiff's contention that all permits that had been issued pursuant to the settlement agreement should be revoked. The court concluded that the issue of permit revocation was an administrative issue, and with the settlement agreement voided, administrative hearings at the instance of citizens would no longer be a futile exercise.

Real parties appealed and plaintiff cross-appealed. We granted applications from the Westwood South of Santa Monica Blvd. Homeowners Association and the Westwood Homeowners Association, and from the League of California Cities, to file amicus curiae briefs.

## DISCUSSION

### 1. *Real Parties' Appeal*

Real parties contend the judgment should be reversed on any or all of five bases. First, they say, the settlement was incorporated in a stipulated judgment in the Vista reverse validation action, and an attack on a judgment in an in rem validation action is barred by the validation statutes. (Code Civ. Proc., § 870.) Second, plaintiff cannot collaterally attack a judgment in a case where the superior court had fundamental jurisdiction over the underlying litigation. Third, plaintiff failed to exhaust administrative remedies. Fourth, the trial court erred in concluding the settlement agreement was an ultra vires act, and fifth, the trial court, on the record before it, had no authority to summarily grant writ relief voiding the entire settlement agreement.

None of these contentions has merit.

#### a. *The validation statutes do not prevent plaintiff's lawsuit.*

Real parties argue that the validation statutes (Code Civ. Proc., § 860 et seq.) bar plaintiff's lawsuit. Section 870, subdivision (a) governs the effect of a judgment in validation proceedings, stating that, if no appeal is taken

from the judgment (or the judgment is affirmed), "[t]he judgment . . . shall, notwithstanding any other provision of law . . . thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive." According to real parties, because the stipulated judgments in the Vista reverse validation proceedings—including terms incorporating the settlement agreement—were not appealed, the judgments are conclusive against the world "as to all matters therein adjudicated or which at that time could have been adjudicated . . . ." (*Ibid.*) Real parties are mistaken.

Validation proceedings are most commonly used " 'to secure a judicial determination that proceedings by a local government entity, such as the issuance of municipal bonds and the resolution or ordinance authorizing the bonds, are valid, legal, and binding.' " (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842 [73 Cal.Rptr.2d 427].) The validation statutes "should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' [Citation.]" (*Ibid.*) A validation action is "in the nature of a proceeding in rem" (Code Civ. Proc., § 860) and "operates against property, as distinct from an injunction that operates against persons" (*Friedland*, at p. 843). "[I]ts effect binds the agency and all other persons." (*Ibid.*)

As already stated, a validation (or reverse validation) action must be authorized by another statutory provision. (Code Civ. Proc., § 860.) Here, Vista's challenge to the sign fee ordinance was authorized by Government Code sections 66014 and 66022, which require an action challenging an ordinance authorizing a fee for building permits, use permits and the like to be brought under the validation statutes within 120 days of passage of the ordinance.

The Vista action was a proper reverse validation action, challenging the validity of the sign fee ordinance, and a judgment validating or invalidating the fee would have barred any suit challenging that ordinance by anyone on any ground. But real parties' stipulated judgment (and the stipulated judgments obtained earlier by Vista and later by Regency Outdoor, Inc.) neither validated nor invalidated the sign fee ordinance, and the settlement agreement covered matters far beyond the scope of those subject to the validating statutes—matters that were not litigated and were not subject to or proper for litigation under the validation statutes. As Judge Chalfant pointed out, because the stipulated judgments do not validate or invalidate the sign fee,

and do not purport to affect any third party, the judgments do not and cannot bar this suit (which does not even purport to challenge the sign fee ordinance).

Real parties' reliance on *Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781 [107 Cal.Rptr.2d 6] (*Embarcadero*) and *Bernardi v. City Council* (1997) 54 Cal.App.4th 426 [63 Cal.Rptr.2d 347] (*Bernardi*) is misplaced. In *Embarcadero*, the court found a municipal improvement district lacked standing to challenge a tax allocation among the county and various special districts, and also that the action was barred by the statute of limitations because the tax allocation was an intermediate step in an annexation that had been approved in a validation action and had become conclusive. In *Bernardi*, appellants city and redevelopment agency acknowledged that a 1977 stipulated judgment validating a redevelopment plan was binding and conclusive, but sought to modify provisions capping the tax dollars allocated to the project and restricting debt to finance the project, claiming those provisions did not concern the "validity" of the plan. The Court of Appeal concluded there was no jurisdiction in 1995 to modify the judgment, holding the fiscal cap and debt deadline provisions of the 1977 validating judgment were "integral parts thereof and therefore are as binding and conclusive as the validating provision therein." (*Bernardi, supra,* at p. 437, italics omitted.)

We think it is obvious that nothing in *Embarcadero* or *Bernardi* supports the proposition that the validation statutes bar plaintiff's challenge to the settlement agreement (or the stipulated judgment) in this case. The terms of the settlement are far afield from the sign fee ordinance that was the subject of the validation action. The settlement agreement allows real parties to modernize offsite signs by altering them with digital displays, in contravention of the 2002 sign ban that would otherwise prevent such alterations; these and many other settlement provisions exempting real parties from municipal regulations have nothing at all to do with the validity of the sign fee ordinance.

Unlike the case in *Embarcadero*, the challenged settlement provisions are not an "intermediate step" without which the sign fee ordinance could not be validated. (See *Embarcadero, supra,* 88 Cal.App.4th at pp. 786, 790.) Unlike the case in *Bernardi*, none of the challenged settlement provisions concern the validity of the sign fee ordinance; none of the challenged provisions is "inextricably intertwined with the validating language" of the stipulated judgment, or "part and parcel of the validating judgment" (*Bernardi, supra,* 54 Cal.App.4th at p. 438)—indeed, there is no "validating language" in the stipulated judgment, and there is no "validating judgment."

Plaintiff chose not to challenge the sign fee ordinance in the Vista action (and does not do so in this lawsuit). Plaintiff was not required to have done so in order to challenge the terms of a settlement (or stipulated judgment) that goes far beyond matters that were the legitimate subject of a validation action—a judgment that neither validates nor invalidates the sign fee ordinance and does not by its terms purport to bind third parties. In short, real parties' effort to characterize the stipulated judgment in this case as inextricably intertwined with the sign fee ordinance and as similar to the one in *Bernardi* is entirely without merit. The validation statutes do not prevent this lawsuit.

    b.   *Legal principles barring collateral attack on a judgment do not apply.*

Next, real parties make an elaborate argument to the effect that, because Judge Dau had fundamental jurisdiction in the Vista action to enter the stipulated judgment, plaintiff may not "collaterally attack" the stipulated judgment. They point to cases stating the well-established proposition that a litigant "may not collaterally attack a final judgment for nonjurisdictional errors." (E.g., *Estate of Buck* (1994) 29 Cal.App.4th 1846, 1854 [35 Cal.Rptr.2d 442] [" ' "If a judgment, no matter how erroneous, is within the jurisdiction of the court, it can only be reviewed and corrected by one of the established methods of *direct* attack." ' "].) That principle does not apply here.

First, plaintiff was not a litigant in the Vista action, and had no notice of the settlement agreement or its terms. Under those circumstances, there was no avenue by which plaintiff could have or should have used " ' "one of the established methods of *direct attack*" ' " on the judgment. (*Estate of Buck, supra*, 29 Cal.App.4th at p. 1854.) Second, plaintiff does not purport to challenge the judgment; its claim is that the city acted beyond its authority when it entered into a settlement agreement, of which plaintiff had no notice, exempting real parties from numerous provisions of the municipal code. Nonparties cannot be deprived of the right to challenge illegal municipal action simply because the parties to a settlement put those terms into a stipulated judgment. The legality of the settlement agreement was not adjudicated in the Vista action; in *Bernardi*'s language, the judgment incorporating the settlement terms "was the product of a *stipulation* among the parties in which the trial court acquiesced, rather than a judicial determination as to the [settlement agreement's] validity . . . ." (*Bernardi, supra*, 54 Cal.App.4th at p. 437.) In short, the prohibition on collateral attacks on a judgment simply has no application to this lawsuit.

In a related argument, real parties contend that one superior court judge may not overrule another. (*Ford v. Superior Court* (1986) 188 Cal.App.3d 737,

741–742 [233 Cal.Rptr. 607].) Real parties say Judge Dau "impliedly" concluded the settlement was not an ultra vires act by the city, "made his own binding determination as to the validity of the Settlement Agreement and entered judgment accordingly," and Judge Green "supplant[ed] Judge Dau's ultra vires ruling." Again, we disagree, both on the facts and the law. While Judge Dau addressed ultra vires arguments in connection with Vista's stipulated settlement, and real parties assert their settlement was modeled on the Vista settlement, the fact remains that Judge Dau did *not* adjudicate the ultra vires issue in connection with real parties' settlement—indeed, no one, so far as the record shows, objected to the settlement on that ground. And, as plaintiff points out, it is difficult to conceive how plaintiff or anyone else could have objected to the settlement agreement without knowing about it.

And, in any event, we agree with Judge Green that it was beyond the trial court's power to enter a stipulated judgment adopting the terms of a settlement agreement that was ultra vires or otherwise exceeded the scope of the city's authority. (Cf. *Welsch v. Goswick* (1982) 130 Cal.App.3d 398, 412 [181 Cal.Rptr. 703] (conc. opn. of Staniforth, Acting P. J.) ["In general, stipulated judgments fail if they enforce illegal agreements."].)

### c. *There is no merit to the claim plaintiff failed to exhaust administrative remedies.*

The basis for plaintiff's standing to sue in this case was its status as a property owner injured by the settlement agreement. Plaintiff owned a sign on Pico Boulevard, near one of the signs real party Clear Channel was able to digitize under the settlement agreement, without the public hearings otherwise required. Real parties contend there was an administrative remedy available to redress plaintiff's injury—that under the municipal code, plaintiff could have challenged the modernization permit the city issued for Clear Channel's Pico Boulevard sign. (The municipal code allows an administrative appeal to challenge "determinations of the Department of Building and Safety where it is alleged there is error or abuse of discretion in any order, interpretation, requirement, determination or action made by the Department . . . ." (LAMC, § 12.26(K)).)

We need not linger over a discussion of the doctrine of exhaustion of administrative remedies. Plaintiff challenged the legality of the settlement agreement, not the issuance of the particular permit that gave plaintiff standing to challenge the settlement agreement. As the trial court observed, real parties cite no authority requiring a party to exhaust administrative remedies before challenging an illegal government contract, "or any administrative avenue by which [plaintiff] could have challenged the Settlement Agreement." In any event, it would have been futile for plaintiff to pursue an administrative remedy.

As the trial court observed, the city considered itself bound by the terms of the settlement agreement "to issue the permits to [real parties] for their digital billboards, including the one on Pico [Boulevard]." The settlement agreement—and the stipulated judgment—expressly state that the city "will not voluntarily assist" (or "shall not voluntarily assist") any third party challenge to the settlement agreement, or to the judgment, "or to any application for permits or approvals under" the settlement or judgment, and that the city would not "take any position adverse to [real parties] in connection with such third-party challenge." Under these circumstances, we agree with the trial court it would have been futile for plaintiff "to administratively challenge permits issued by the City under an agreement that the City voluntarily entered and which purports to bind the City to issue those very permits."

Real parties point out that, since the settlement agreement, at least four administrative appeals have been filed by others seeking review of permits issued to or requested by real parties for the maintenance and modernization of old signs, and in two of the three appeals that went forward (Clear Channel withdrew its application in one case), the director's delegate ruled in favor of the challenger. But as real parties themselves note, those adverse decisions related to regulations "not at issue in [plaintiff's] petition." Moreover, the three appeals that real parties point to were decided after Judge Green's invalidation of the settlement agreement. As the trial court observed, "[w]ith the protections of the Settlement Agreement gone, the City's administrative hearings would no longer be a futile exercise . . . ."

In sum, plaintiff correctly observes that the outcome of any administrative challenge was "contractually preordained." That being so, we can think of no greater exercise in futility, and consequently the exhaustion doctrine, even if otherwise applicable, does not apply here.

    d.   *The trial court did not err in finding the settlement agreement was an invalid, ultra vires act.*

The trial court concluded that the settlement agreement allowed the city and real parties to circumvent the general ban in the municipal code on alterations to existing offsite signs. (See LAMC, former § 14.4.4(B)11, § 12.21(A)7(*l*).) And, because land use regulations involve the exercise of police power, and "the government may not contract away its right to exercise the police power in the future" (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*)), the city's agreement to do so was ultra vires. The trial court was correct.

■ The legal authorities are clear. *Avco* stated the applicable principle. In *Avco*, a new land use requirement (a permit from the coastal zone commission) was enacted before the developer had obtained a building permit for a project, but after the developer had performed prepermit construction work. *Avco* held a developer had no vested right to complete a project before building permits were issued. (*Avco, supra*, 17 Cal.3d at pp. 788, 791, 793, 796.) In rejecting an estoppel argument (based on an agreement between the developer and the county permitting the development of the tract in accordance with planned community zoning, regulations and a tract map), *Avco* said that the government "may not contract away its right to exercise the police power in the future," and "even upon the dubious assumption that the [agreement] constituted a promise by the government that zoning laws thereafter enacted would not be applicable to [the tract], the agreement would be invalid and unenforceable as contrary to public policy." (*Id.* at p. 800.)

Perhaps the most pertinent of the authorities following *Avco* is *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172 [41 Cal.Rptr.3d 200] (*Trancas*), where the court found a settlement agreement between a city and a developer "intrinsically invalid because it includes commitments to take or refrain from regulatory actions regarding the zoning of Trancas's development project, which may not lawfully be undertaken by contract." (*Id.* at pp. 180–181.) In *Trancas*, the court identified two unacceptable provisions of the settlement: the city guaranteed that the proposed development "would not be blocked by future zoning," and that the developer would not be required to comply with zoning density restrictions, existing or future. (*Id.* at p. 179.) The *Trancas* court said that the "promise to abjure legislative zoning action was unlawful," citing *Avco*. (*Trancas*, at p. 181.) As for the exemption from density requirements, the court said: "it rather plainly constitutes agreement that the development need not comply with density limitations different from the density set forth in the [developer's] covenant." (*Ibid.*) The court observed that the exemption "functionally resembles a variance," a departure from standard zoning that requires administrative proceedings and public hearings, and "[c]ircumvention . . . by contract is impermissible." (*Id.* at p. 182 [settlement agreement gave Trancas a "red carpet" around future density requirements].)

Nothing distinguishes *Trancas* from this case. At bottom, real parties rely on one proposition in their insistence that the settlement agreement was not a surrender of the police power. Real parties contend that, so long as the settlement "reserves the municipality's right to enact new laws in the future and apply them to the settling party," the city has not "surrender[ed] its *control over* its police power." Real parties rely on several cases to illustrate this "critical distinction" between a city's "permissible agreement to constrain its conduct and an impermissible, ultra vires agreement in which the municipality surrenders or abnegates control of its police power." (Italics omitted.)

But real parties misread the import of these cases. None of them stands for the proposition that a city may agree to exempt settling parties from current municipal ordinances prohibiting certain conduct, so long as the city makes no explicit promise to refrain from enacting future legislation that would subject settling parties to those prohibitions. (See, e.g., *Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196] [when city breached promise to provide sewer connections, large-scale home developer could enforce annexation agreements because annexed lands were to be developed in accordance with the city's master plan and ordinances, and developer paid sewer connection fees as fixed by ordinance or agreement]; *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 233 [100 Cal.Rptr.2d 740] [upholding development agreement between county and developer that, among other things, froze zoning on the property for up to five years; the zoning freeze was not a surrender or abnegation of county's land use regulation function where county had authority to enter into contracts to carry out that function, the project had to be developed in accordance with the county's general plan, the county had to approve detailed building plans, the county retained discretionary authority in the future, and the zoning freeze was of limited duration and preserved future options].)

Without indulging in a discussion of all the cases on which real parties rely, none involves a settlement agreement that gives the settling parties an exemption from ordinances currently in effect. They all involve whether or not the municipality has agreed to refrain from legislating in the future. This is not such a case. This is a case where the settlement agreement purports to exempt the real parties from a host of currently existing ordinances and regulations.

Real parties then fall back on their claim that the 2002 sign ban (and, presumably, the list of other code provisions and ordinances from which the settlement agreement exempts real parties) did not in fact restrict the modernizations and repermitting allowed under the settlement agreement. (In other words, the 2002 sign ban never did prohibit the alteration of signs by adding digital displays, so (one must assume) real parties, and others, were always at liberty to do so.)

We cannot agree. The 2002 sign ban expressly prohibited offsite signs, and stated: "This [prohibition] shall also apply to alterations or enlargements of legally existing off-site signs." (L.A. Ord. No. 174547, § 2.11.) We do not see how the language could be plainer, or how the prohibition could conceivably be construed to exclude from its scope an alteration consisting of converting an ordinary billboard to one with a digital display.

Real parties rely most heavily on the city's representation and warranty in the settlement agreement that "City zoning regulations do not restrict the other Modernizations or re-permitting allowed pursuant to this Agreement, and . . . no Modernization or re-permitting for an existing structure shall be denied based on zoning regulations." We are not persuaded by the syllogism that the city agreed to permit the sign alterations, the city said zoning restrictions do not apply, and therefore the alterations are legal. If the city's warranty were dispositive, there would be no such thing as an illegal contract. It is for the courts to determine the meaning of statutes or ordinances at issue in a lawsuit, not the parties to the contract.

■ In sum, the cases are clear that an agreement to circumvent applicable zoning laws is invalid and unenforceable. That is precisely what happened here; the settlement agreement exempted real parties from prohibitions in the 2002 sign ban and other regulations. Real parties' fundamental premise—that an agreement by the city is not ultra vires, so long as it does not "contractually exempt a private property from all future legislative and regulatory control"—is simply wrong. An agreement is ultra vires when it contractually exempts settling parties from ordinances and regulations that apply to everyone else and would, except for the agreement, apply to the settling parties. The trial court's ruling was correct.

   e.   *The trial court correctly granted writ relief and correctly voided the entire settlement agreement.*

Real parties' final argument is that writ relief voiding the entire settlement was improper because the record does not support it—specifically, they say, the record does not support either a summary determination in plaintiff's favor or the invalidation of the entire settlement agreement. They are mistaken.

"Mandamus relief is . . . available to 'correct those acts and decisions of administrative agencies which are in violation of law . . . .' [Citation.]" (*Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752 [85 Cal.Rptr.2d 512].) Indeed, the court in *Trancas* ordered the trial court to grant a writ of mandate requiring the city to set aside a settlement agreement. (*Trancas, supra*, 138 Cal.App.4th at p. 188.)

Real parties assert there are factual issues that must be resolved before an ultra vires determination may be made. As will be evident from our previous discussion, we do not agree. Real parties point to evidence from their own company officials to the effect that the city "never claimed any conflict" between the settlement agreement and then existing city ordinances; that no one intended to override city laws; that alteration of offsite signs to digital

signs was not "clearly or expressly prohibited"; that the city could change its ordinances in the future (and did in 2008); and that the record contains disputed questions of fact about plaintiff's right to challenge the settlement agreement (claims that plaintiff unreasonably delayed in bringing suit, should have participated in the reverse validation action, and has unclean hands because it "regularly failed to comply with City regulations . . .").

Most of these claims are restatements of contentions already rejected, and we need not discuss them further. As for the claims of unclean hands and laches, the trial court expressly addressed and rejected both defenses. The trial court found that the claim of unclean hands cannot be invoked "where, as here, the act sought to be enjoined is against public policy." (See *Jomicra, Inc. v. California Mobile Home Dealers Assn.* (1970) 12 Cal.App.3d 396, 402 [90 Cal.Rptr. 696].) The trial court rejected the laches defense because of uncontradicted evidence plaintiff did not know of the settlement agreement until after the time for appeal had passed, and in any event plaintiff filed suit in federal court within three months after the stipulated judgment was entered. We see no basis to conclude the trial court erred in rejecting these defenses.

The claim that the trial court should not have invalidated the entire settlement agreement is also without merit. This claim, as we understand the argument, is that plaintiff was affected by only one "modernization"—the one on Pico Boulevard that gave plaintiff standing to challenge the settlement agreement—and so the trial court could not order the city "to set aside and cease implementing the Settlement Agreement with respect to *all* modernization permits and all *replacement* permits as well . . . ." Real parties say there was "no record to support that relief" and the claim for such relief "was not and is not ripe."

■ The trial court correctly concluded: "[T]he central purpose of the Settlement Agreement—the exemption of [real parties] from zoning laws in return for certain alleged benefits to the City—is illegal, so the contract as a whole cannot stand." In addition, the court looked to the severability provision, which states that if any provision were held invalid or unenforceable, the real parties would be entitled to a refund of all fees or other moneys paid to the city under the agreement (as the trial court put it, real parties "are restored to their original position")—so the court concluded the parties intended the agreement to be an integrated whole. The court did not err. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124 [99 Cal.Rptr.2d 745, 6 P.3d 669] ["If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced."].)

## 2. *Plaintiff's Appeal*

Plaintiff contends the trial court erred in refusing to revoke all the digital conversion permits the city issued to real parties under the illegal settlement agreement. Plaintiff argues that because the settlement agreement was unlawful (conflicting with the 2002 sign ban), the permits issued pursuant to the settlement agreement, which could not have been issued if the city had enforced the 2002 sign ban against real parties, must, like the settlement agreement, be void. Plaintiff relies on *Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1356 [22 Cal.Rptr.3d 295] (*Horwitz*) ("[j]ust as the City has no discretion to deny a building permit when an applicant has complied with all applicable ordinances, the City has no discretion to issue a permit in the absence of compliance"), and *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813, 819 [110 Cal.Rptr. 262] (*Pettitt*) ("the City cannot be estopped to deny the validity of a permit . . . issued or made in violation of the express provisions of a zoning ordinance"). We agree with plaintiff.

The trial court's view was that, while the settlement agreement was "void for all purposes," nevertheless the issue of permit revocation was an administrative issue, to be decided on a sign-by-sign basis. The trial court said: "With the protections of the Settlement Agreement gone, the City's administrative hearings would no longer be a futile exercise and the City must apply its codes equally to all. Citizen challenges to the billboards could be made on an individual basis, with the merits of each determined independently. The People's elected representatives, and their appointees, are in the best position to make these determinations and to decide what standards are to be applied. This Court is also mindful that, in pursuing its course of action over the last few years, the [real parties] relied on an agreement sanctioned by the Superior Court. Such reliance is reasonable, even if later this and other courts find that agreement invalid."

Real parties say the trial court was correct (among other reasons) because there was no evidence in the record "as to whether [the Department] would have (or could have) issued any given permit even if the City had not entered into the Settlement Agreement," and real parties should be given an opportunity to argue, in administrative proceedings for each sign, that the city should be equitably estopped from revoking their permits. Further, they say, this case "does not involve a situation where companies are seeking to keep permits that unambiguously were precluded by law at the time they were issued."

But the trial court held, and we have held, that digital conversions were indeed unambiguously prohibited by the municipal code at the time of the

settlement agreement. Moreover, the reasonableness of real parties' reliance on the settlement agreement, to which the trial court referred, is not the relevant standard where land use ordinances are involved. Where land use is at issue, "there is no meaningful distinction between an estoppel claim and a vested right claim . . . ." (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 [82 Cal.Rptr.2d 649] (*Toigo*) ["estoppel can be invoked in the land use context in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow' "].)

In this case, real parties say they reasonably relied to their detriment (1) on the city's express representations in "a heavily-negotiated settlement that was disclosed to the public, approved by the City at the highest levels, and entered as a stipulated judgment by a judge of the Superior Court" and (2) on the modernization permits issued by the Department, as real parties invested in the modernization and entered into long-term contracts with advertisers. We do not think this reliance and detriment—by parties that vehemently argued that the city's settlement with Vista was "*ultra vires* and void" because it circumvented requirements for public hearings and public notice when land use decisions are being made—suffice to meet the requirements stated in *Pettitt* and other cases. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496–497, 493 [91 Cal.Rptr. 23, 476 P.2d 423] ["an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . .' "].)

■ In short, permits issued in contravention of municipal ordinances are invalid, and equitable estoppel is available against the government "in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' [Citation.]" (*Toigo, supra*, 70 Cal.App.4th at p. 321.) This is clearly not such a case. (See *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1372 [56 Cal.Rptr.3d 591] ["in land use cases, ' "each case [of governmental estoppel] must be examined carefully and rigidly to be sure that a precedent is not established through which, by favoritism or otherwise, the public interest may be mulcted or public policy defeated" ' "].)

Real parties make several other arguments as to why their permits should remain in place pending administrative hearings on a sign-by-sign basis, but none of them has merit. They say plaintiff had no standing to challenge any of the other permits issued under the settlement agreement (other than the one on Pico Boulevard), so it cannot obtain their revocation as relief. The only authority it cites for this assertion is *Summers v. Earth Island Institute* (2009)

555 U.S. 488 [173 L.Ed.2d 1, 129 S.Ct. 1142]. Real parties do not explain how that case supports their point, and it does not; we decline to discuss this inapposite authority.

Next, real parties say the trial court was correct because a writ of mandate may not issue to compel an exercise of discretion, and plaintiff did not show that the city violated a "clear, present, ministerial duty" in issuing each permit; they say the decision "whether to revoke any given permit under which all work had been completed" is within the city's discretion. No authority is cited except the municipal code, which gives the Department of Building and Safety the authority (not the duty) to revoke permits. (LAMC, §§ 91.6201.2.3, 98.0601(a)1.) But, as we have seen, the city does not and did not have the discretion to issue permits that contravened existing municipal ordinances. (See *Horwitz, supra*, 124 Cal.App.4th at p. 1356 ["the City has no discretion to issue a permit in the absence of compliance" with municipal ordinances].)

Real parties also claim that a judgment invalidating all digital conversion permits would be improper because the relief would be "grossly excessive in relation to the harm [plaintiff] claimed," and a court should always strive for " 'the least disruptive remedy adequate to its legitimate task.' [Citation.]" (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1476, 1480 [47 Cal.Rptr.3d 147].) We see nothing "grossly excessive" in the revocation of illegal permits issued under an illegal settlement agreement that contravenes municipal ordinances.

Finally, real parties say the trial court did not abuse its discretion in refusing to order permit revocation, because plaintiff told the trial court that it was not seeking invalidation of all the permits. This misconstrues plaintiff's statements, which merely indicated its position throughout that it was challenging the settlement agreement, as opposed to challenging a particular permit. In sum, there was no legal basis for the trial court's refusal to revoke digital conversion permits that were issued under an illegal settlement agreement and in violation of unambiguous municipal ordinances.

## DISPOSITION

The order granting plaintiff's motion for judgment on the peremptory writ of mandate is affirmed to the extent it requires the city to set aside and cease implementing the settlement agreement entered into with real parties dated September 30, 2006. The order is reversed to the extent it finds that the issue of permit revocation is an administrative issue to be decided on a case-by-case basis, and the cause is remanded to the trial court with directions to

amend its order so that it invalidates all digital conversion permits issued by the city to real parties under the settlement agreement. Plaintiff shall recover its costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.

Petitions for a rehearing were denied January 9, 2013, and the petition of real parties in interest for review by the Supreme Court was denied February 27, 2013, S208176.