[Civ. No. 36536. First Dist., Div. Four. May 27, 1976.]

MORRISON HOMES CORPORATION, Plaintiff and Respondent, v. CITY OF PLEASANTON, Defendant and Appellant.

COUNSEL

Kenneth C. Scheidig, City Attorney, Tinning & DeLap and John J. Carniato for Defendant and Appellant.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Roderick Walston and Richard C. Jacobs, Deputy Attorneys General, Robert J. Logan, City Attorney (Livermore), Gary B. Reiners, Assistant City Attorney, Melvin Johnsen, City Attorney (Eureka), Mathew L. Hudson, City Attorney (Petaluma), Samuel B. McGrath, City Attorney (Richmond), Peter G. Stone, City Attorney (San Jose), Daniel J. Curtin, Jr., City Attorney (Walnut Creek), John W. Corbett and David Tranberg, City Attorneys (Arcata), John M. Powers, City Attorney (Vallejo), and John Noonan, City Attorney (South San Francisco), as Amici Curiae on behalf of Defendant and Appellant.

Bell, Dunlavey, Rosenberg & Miles, Bell, Dunlavey & Rosenberg and Robert Rosenberg for Plaintiff and Respondent.

OPINION

RATTIGAN, J.—The City of Pleasanton (hereinafter "the City") appeals from a judgment which (1) requires it to perform certain obligations assumed by it in a series of written contracts providing for the

annexation of lands to it, and (2) awards accrued and ongoing damages, to respondent Morrison Homes Corporation, for the City's breach of the obligations.

*Facts*

The record supports the following recitals of fact: The City is a general law city. Respondent is a corporation engaged in a large-scale business of constructing and selling homes on lands owned, subdivided and developed by it. In and between 1963 and 1967, the parties entered into five successive written contracts[1] to which they refer, collectively, as "annexation agreements."[2] In each of the four contracts which were "annexation agreements" as such (see fn. 2, *ante*), the parties agreed in pertinent part as follows:

The City would annex by ordinance, and respondent (designated in each contract as "Owner") would cooperate in the annexation of, separate lands which were "controlled by Owner" and specifically described. The City would zone the affected land, upon an "interim or holding zone" basis, in the respective annexation ordinance. Owner would pay to the City an agreed per-acre "annexation fee."

The land annexed would be subject to all real property taxes levied by the City. Owner explicitly consented to the land being subject to taxation for the City's bonded indebtedness. Owner would improve certain streets and construct designated off-tract and on-tract improvements tying into the City's water supply, sewage disposal and storm drainage systems. The City "acknowledged" that its water supply was "adequate . . . to serve

---

[1]The party which actually entered into the five contracts with the City was D. and V. Builders, Inc., of which respondent became the successor in interest in a corporate merger executed in 1970. We accordingly refer to "respondent" as one of the original contracting parties.

[2]The parties executed the first contract on December 9, 1963, the second on September 7, 1965, two more on June 6, 1966, and the fifth on May 15, 1967. In all but the second one executed on June 6, 1966, they specifically agreed upon the annexation of respectively described lands to the City. Because these four contracts were therefore "annexation agreements" in the literal sense, we refer to each as such by its respective year. Annexation of land was not specifically agreed upon in the fourth contract (i.e., the second one executed on June 6, 1966), but it expressly modified the first three, and had future application, as to the "capacity . . . reserved" by the City to provide adequate sewer services to respondent's lands annexed or to be annexed. (See fn. 3, *post.*) We refer to the fourth contract as the "1966 reservation agreement."

Owner's proposed development and that such supply will be maintained."[3]

The provisions of the agreements which are the subject of this litigation pertained to the collection and disposition of sewage from the annexed land through the City's existing sewage treatment plant and related facilities. These provisions were finally stated in the 1966 reservation agreement, which modified the preceding contracts and extended to the future in this respect.[4] We refer to them, using the parties' nomenclature, as the City's "sewer commitment."

Commencing shortly after the first annexation agreement was executed in 1963, and pursuant to it and the subsequent annexation agreements (see fn. 2, *ante*), respondent's various tracts were successively annexed to the City. The annexed lands were developed as agreed, and the City provided new sewer connections and services to homes built upon them by respondent. This activity went on until it was interrupted as a result of action by the San Francisco Bay Area Regional Water Quality Control Board (a state agency, hereinafter "Regional Board" or "Board") as next described.

At all pertinent times the Porter-Cologne Water Quality Control Act (Wat. Code, div. 7, commencing with § 13000; see § 13020), and its predecessor statutes, vested the Regional Board with jurisdiction in matters which involved the quality of ground water in the area of the City. Prior to the execution and performance of the annexation agreements by the City and respondent, the Board had become

[3]These typical provisions appeared, in varying terms, in some or all of the annexation agreements. They are summarized here as they appear in the one executed on December 9, 1963.

[4]As pertinent, the 1966 reservation agreement stated:

"1. RECITALS. . . . Owner desires commitment from City in addition to those expressed in the . . . [1963, 1965 and 1966 annexation agreements] . . . that the lands of Owner annexed to City pursuant to such annexation agreements as well as the additional lands controlled by Owner . . . [and specifically described herein] . . . [and which Owner and City contemplate will be annexed to City] will be assured capacity in their developed condition in the . . . [described sewer facilities] . . . and sewage treatment plant of City. . .

"4. CITY AGREES that it has committed to the lands of Owner annexed to City under the . . . [1963, 1965 and 1966 annexation agreements] . . . and to the additional property controlled by Owner . . . [and described herein] . . . sufficient sewage capacity in the . . . [City's described sewer facilities] . . . and City treatment plant to serve such lands as developed in accordance with such annexation agreements, City's master plan and ordinances and that such capacity will be reserved by City for such purposes. Such capacity is hereby defined as 2,072 equivalent sewer units. . . ." Translated, the last-quoted sentence defines the "capacity . . . reserved" as sewer connections for 2,072 homes.)

concerned with the detrimental effect of local sewage treatment in the area. By 1966, it had adopted a program designed to eliminate small treatment plants and to bring about the participation of local communities in regional sewage systems. The City's treatment plant (the so-called "Sunol plant") had meanwhile become obsolescent, overloaded, and the source of several waste-discharge and related problems with which the Board was specifically concerned. Motivated by these events, the City entered into a written contract with Valley Community Services District ("VCSD") in 1967. VCSD was a nearby local governmental agency which had recently completed a new sewage treatment plant. Its sewage activities were also subject to the territorial water-quality jurisdiction of the Regional Board.

In its 1967 contract with the City, VCSD agreed to provide sewage treatment to certain areas of the City. The affected areas included the tracts annexed to the City pursuant to its annexation agreements with respondent. A principal purpose of the 1967 contract, from the City's standpoint, was to reduce the volume of sewage being treated by it at the Sunol plant. Long-range objectives of the contract included the City's "phase-out" of the Sunol plant and the parties' agreement upon a comprehensive sewage-treatment plan for the entire area in which both were located.

The City's arrangement with VCSD did not alleviate the Regional Board's concern with water-pollution problems arising from waste discharge at the Sunol plant. In 1971, the Board adopted a cease and desist order which prohibited any new connections to the plant. The order interrupted the availability of sewer connections upon respondent's tracts which had been annexed to the City.

Among several steps then taken by the City to relieve the situation, it commenced litigation against VCSD. It also spent approximately $46,000 in an attempt to improve the Sunol plant. The Regional Board thereupon amended its 1971 order to permit new sewer connections to the plant, but upon condition that violation of the Board's waste-discharge standards did not recur there. The City provided some of these connections to homes built on respondent's annexed tracts, but the Regional Board found continued violations at the Sunol plant. This resulted in a further cease and desist order, issued by the Board in 1973, which prohibited any additional sewer connections to the plant except upon conditions requiring compliance with specified waste-discharge standards of the Board.

When the 1973 order was issued, the City again discontinued making new sewer connections available in respondent's annexed tracts. At the time, respondent had been granted all but 463 of the 2,072 connections for which the City had "reserved" sewer "capacity" in the 1966 reservation agreement. (See fn. 4, *ante.*) Respondent then commenced the present action upon the annexation agreements.

### The Action, Trial and Judgment

In its "Complaint For Declaratory Relief And Damages," respondent sought a judgment (1) declaring that the City's "sewer commitment" was "a binding enforceable obligation of [the] City," (2) requiring the City to perform it, and (3) awarding respondent damages for its breach. In its answer, the City pleaded material admissions and denials and various affirmative defenses. Immediately prior to trial, the City moved the trial court for an order bringing VCSD, the Regional Board, and various property owners into the action as parties. The court denied this motion and proceeded to trial.

After receiving evidence of the events described under "Facts," *supra,* and of other matters to be mentioned, the trial court filed findings of fact and conclusions of law favorable to respondent and entered the judgment from which the City appeals.[5]

### The Appeal

The Regional Board and the State Water Resources Control Board, its parent agency (see Wat. Code, § 13100 et seq.), have joined in two successive amicus curiae briefs filed by the Attorney General in support of the appeal. Several other cities have joined in a similar brief. The City and amici do not challenge the trial court's interpretation of any of the

---

[5]The judgment is long and detailed. Paraphrased for this reason, it (1) orders that the City "specifically perform" the annexation agreements and the 1966 reservation agreement, relative to the sewer connections promised (see fn. 2, *ante*); requires it to furnish respondent with the remaining 463 sewer connections to which it is entitled under the agreements; (3) further requires it to improve its sewage facilities and treatment plant as necessary for these purposes; (4) prohibits it from delaying the development of respondent's tracts for any reason based upon an asserted lack of capacity or ability to serve them in the City's sewer facilities; and (5) awards respondent $26,075 in accrued damages, and ongoing damages on a per diem or per-sewer-connection basis, for the City's breach of the agreements.

The judgment does not expressly grant declaratory relief to respondent as prayed in its complaint, but its entitlement to such relief is fairly stated in the trial court's findings and conclusions.

contracts involved, nor the sufficiency of the evidence relative to the City's breach of the annexation agreements and the damages awarded, as reflected in the court's findings and conclusions. They do make the contentions next captioned and discussed, some of which were raised by the City as affirmative defenses. None of these contentions may be sustained; for the reasons respectively stated, we modify the judgment and affirm it as modified.

*The Annexation Agreements Are Valid as*
*Municipal Contracts Authorized by Law*

The City asserts that annexation agreements generally, and its "sewer commitment" in particular, are void and unenforceable because they represent an invalid "attempt to contract away the legislative and governmental functions of future City councils." It further contends that, for the same reason, the general and particular obligations are unenforceable because the City council's actions in assuming them were ultra vires. ■ These arguments raise (1) the subject-matter question of the City's authority to enter into a contract concerning the annexation of territory to it or the operation of its municipal sewer system; (2) the question whether it exceeded such authority in entering into the annexation agreements; and (3) the durational question whether a contractual obligation assumed by it on either subject, with the approval of its City council, is binding upon successor councils.

(1) The annexation process involves a legislative function of municipal government, in that a city engaging in it exercises a legislative power expressly delegated to it by the state (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 957 [109 Cal.Rptr. 553, 513 P.2d 601]) in pertinent statutes. (See Gov. Code, tit. 4 ["Government of Cities"], div. 2, ch. 1 ["Annexation of Territory," commencing with § 35000].) Its establishment and operation of a municipal sewer system is a "governmental function" (*Southern Cal. Gas Co.* v. *City of L. A.* (1958) 50 Cal.2d 713, 715-718 [329 P.2d 289]) which it may perform under constitutional and statutory authority alike. (Cal. Const., art. XI, § 7;[6] *id.,* former § 11 [repealed and reenacted as § 7 in 1970]; Gov. Code, § 38900;[7] *Longridge Estates* v. *City of Los Angeles* (1960) 183 Cal.App.2d 533, 539 [6 Cal.Rptr. 900]. See

---

[6]"A county *or city* may make and enforce within its limits all local, police, *sanitary,* and other ordinances and regulations not in conflict with general laws." (Italics added.)

[7]"38900. A city legislative body may construct, establish; and maintain drains *and sewers.*" (Italics added.)

Health & Saf. Code, §§ 5470-5471 [authorizing a city to levy charges "in connection with its sanitation or sewerage systems"].) The cited sources of a city's authority to discharge the annexation or sewage functions do not expressly vest it with the authority to contract for either purpose, but they have this effect by necessary implication: "[A] city has authority to enter into contracts which enable it to carry out its necessary functions, and this applies to powers expressly conferred upon a municipality and to powers implied by necessity. [Citation.]" (*Carruth* v. *City of Madera* (1965) 233 Cal.App.2d 688, 695 [43 Cal.Rptr. 855] [annexation contract]. See *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 161-163, 170 [44 P. 358] [sewage disposal contract].) The subject-matter question is thus answered.

(2) ■ The City correctly cites the general rule that a municipality may not "contract away" its legislative and governmental functions. (*McNeil* v. *City of South Pasadena* (1913) 166 Cal. 153, 155-156 [135 P. 32]; 10 McQuillin, Municipal Corporations (3d ed. 1966 rev. volume) § 29.07, pp. 244-247.) The effect of the rule, however, is to void only a contract which amounts to a city's "surrender," or "abnegation," of its *control* of a properly municipal function. (*McNeil* v. *City of South Pasadena, supra,* at p. 156; *Wills* v. *Los Angeles* (1930) 209 Cal. 448, 449-450 [287 P. 962, 69 A.L.R. 1044]; 10 McQuillin, *loc. cit.*)

In the 1966 reservation agreement, the parties referred to respondent's annexed lands "as developed in accordance with . . . [the] . . . annexation agreements . . . [and the] . . . *City's master plan and ordinances.*" (See paragraph 4 of the agreement as quoted in fn. 4, *ante* [italics added here].) Similar reservations of the City's control over the lands appear in the annexation agreements. The evidence shows that respondent paid the City sewer-connection fees, on the lands as annexed and developed, in amounts fixed by ordinance of the City or by agreement. No provision of the various agreements supports the inference, nor is there evidence otherwise, that any of them involved a "surrender" by the City of its *control* of the annexation process or of its sewer operation. The general rule is accordingly inapplicable. (Compare *McNeil* v. *City of South Pasadena, supra,* 166 Cal. 153 at pp. 155-156; *Wills* v. *Los Angeles, supra,* 209 Cal. 448 at pp. 449-450.)

(3) ■ The durational question is readily answered as well. The trial court explicitly determined, upon substantial evidence, that the annexation agreements were "just, reasonable, fair and equitable" as

approved by the respective City councils at the times of their execution.[8] This being so, they were neither void nor voidable because some of their executory features might have extended beyond the terms of office of any of the current City council's members. (*Denio* v. *City of Huntington Beach* (1943) 22 Cal.2d 580, 590-591 [140 P.2d 392, 149 A.L.R. 320]; *Carruth* v. *City of Madera, supra,* 233 Cal.App.2d 688 at p. 695.) ■ The onset of materially changed conditions is not a ground for voiding a municipal contract which was valid when made, nor is the contracting city's failure to have foreseen them. (*Carruth* v. *City of Madera, supra,* at pp. 695-696.)

The annexation agreements are therefore valid, and enforceable against the City, as to any of the three grounds it has invoked in challenging them. This conclusion disposes of its collateral contention that the agreements were void because the City council acted ultra vires in approving their execution. (See 10 McQuillin, Municipal Corporations, *op. cit. supra,* § 29.10, pp. 250-251.)

### The Annexation Agreements Are Not Invalid by Reason of Conflict With the Knox-Nisbet Act

■ The City contends that the annexation agreements are void and unenforceable because their provisions are "repugnant to the public policy" expressed in the Knox-Nisbet Act. (Its similar contention, addressed to the "public policy" of other statutes, pertains to its compliance with the judgment. We reach the point when we discuss that subject *infra.*)

The Knox-Nisbet Act (Gov. Code, § 54773 et seq.), as enacted under that name in 1965 (Stats. 1965, ch. 587, § 10, p. 1916 et seq.), recodified the substantially similar provisions of an earlier enactment. (Stats. 1963, ch. 1808, § 1, p. 3657 et seq.) It establishes a local agency formation commission in each county (Gov. Code, § 54780), and vests it with broad discretionary powers to veto a municipal annexation within the county (§ 54790, subd. (a)(3)) upon application of the legislative purposes and guidelines stated in the act. (§§ 54774, 54790.) According to the City's public policy argument, "[t]he purposes of . . . [the Knox-Nisbet

---

[8]Although this statement appears among the trial court's "Conclusions Of Law," it may constitute a finding of ultimate fact. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 651, p. 2277; compare 4 Witkin, *op. cit.,* Trial, § 333, p. 3135.) If it does, we may treat it as such without regard to its designation. (4 Witkin, *op. cit.,* Trial, § 323, par. (1), p. 3127.) In either event, the determination is supported by the provisions of the annexation agreements themselves (see the text at fn. 3, *ante*) and by other evidence.

Act] . . . would be frustrated if in fact cities were permitted to circumvent the Local Agency Formation Commission by contractual arrangements . . . which would or could defeat the purpose for the creation of said Commission." (We here quote the City's opening brief.)

Nothing in any of the annexation agreements supports the interpretation that it is a "contractual arrangement" which would or could have these effects. In closing argument below, counsel for the City stated in substance that the annexations made pursuant to the agreements had been carried out in compliance with all applicable laws. Such laws necessarily included the pertinent provisions of the Knox-Nisbet Act, whose effective date preceded the annexations.[9] ■ One who enters into a contract with a city is chargeable with knowledge of any legal limitations upon the power which the city is purporting to exercise. (*City of Pasadena* v. *Estrin* (1931) 212 Cal. 231, 235 [298 P. 14]; 10 McQuillin, Municipal Corporations, *op. cit. supra*, § 29.04, p. 219 et seq.) ■ In the 1965 annexation agreement, the parties explicitly stated that the particular annexation would be completed "when in the reasonable judgment of both . . . [parties] . . . , there exists no substantial legal prohibition against the annexation of . . . [the described land] . . . ."

We must conclude that the parties intended the annexation agreements to be performed, and that they were performed, in compliance with the Knox-Nisbet Act. These conclusions refute the argument that the agreements were void because they conflicted with the Act or with the "public policy" expressed in it.

### The Effect of the Action Taken by the Regional Board in 1973

■ The City expressly pleaded, as an affirmative defense, that it had been relieved of its contractual obligations to respondent, as assumed in the annexation agreements, by the terms of the cease and desist order adopted by the Regional Board in 1973. Although the trial court's findings and conclusions rejected this position in detail,[10] the City cites

[9] The legislation from which the Knox-Nisbet Act evolved in 1965, without substantive change for our purposes, took effect in 1963. (Stats. 1963, ch. 1808, p. 3657 et seq.) So far as appears, the first formal annexation of respondent's lands to the City was effective in 1964.

[10] Among other things, the court found as follows: "16. Defendant's [i.e., the City's] contention that it is prevented from furnishing sewer service to plaintiff [respondent] by reason of an order of the . . . Regional Board, issued in April, 1973, which prohibits new connections to defendant's sewer treatment plant, is untrue. Said order was invited and

Civil Code section 1511, subdivision 1, for the proposition that its defense of "excuse" is good, as a matter of law,[11] because its performance of the agreements will violate the order, the Porter-Cologne Water Quality Control Act (pursuant to which the order was adopted), and related statutes pertaining to the quality of the environment. Joining in this argument on behalf of the amici Boards, the Attorney General points out that the order was validly adopted according to law; that it has become final, and is immune from collateral attack in this action, because the City failed to pursue its administrative remedy before the Board; and that the City's performance of its "sewer commitment" must be deemed excused because the order makes it illegal.

All of these arguments rest upon the assumption that the judgment requires the City to act in violation of the order. The assumption is unfounded in light of the whole record; although the judgment itself is not explicit on the subject, the trial court's findings and conclusions indicate that it must be interpreted as mandating the City to perform the annexation agreements in compliance with the order. (See, e.g., the findings quoted in fn. 10, *ante.*) The Attorney General has indicated that the Boards' objections to the judgment will be satisfied if we make it explicit relative to such compliance. Respondent has formally proposed a modification to this end, and no objections to the language thereof have been received from the City or the other amici. In deference to the Boards and their statutory mission, and to avoid leaving the interpretation of the judgment open to question, we hereinafter order the modification substantially as proposed.

---

acquiesced in by defendant; defendant now and at all times since the date of said order has had the ability to comply with the requirements of said Board as a condition to allowance of new connections to defendant's said sewer treatment plant. Defendant's contention that its efforts and desires to 'phase-out' its sewage treatment plant excuse or fulfill its obligations to plaintiff is untrue. 17. Defendant maintains and now has a Sewer Improvement Fund and a Phase-Out Fund which, together, have at least $946,000.00 on deposit; such funds are committed by defendant to make necessary repairs, improvements and modifications to its sewer treatment facilities. 18. Defendant now and at all times since April 10, 1973 [which was apparently the effective date of the Board's order], has had the ability to afford plaintiff the sewer capacity required to be furnished plaintiff under the written agreements between plaintiff and defendant; but, defendant has failed and refused to furnish such capacity."

Similar statements appear in the trial court's conclusions of law. All of these determinations are supported by substantial evidence.

[11]The cited statute provides in pertinent part: "1511. The want of performance of an obligation, . . . in whole or in part, . . . is excused by the following causes, to the extent to which they operate: 1. When such performance . . . is prevented or delayed by . . . *the operation of law* . . . ." (Italics added.)

### The Order Denying the City's
### Motion to Bring in New Parties

■ The City's motion in this regard was formally made, and denied, on the morning the trial commenced. As noticed, it was for an order that *all* "the owners of unimproved property within the service area of the City's Sunol Sewage Treatment Plant be made a party plaintiff [*sic*]," and that VCSD and the Regional Board be made parties defendant.

The showing made in support of the motion established no necessity for the joinder of VCSD. The contractual relationship between VCSD and the City was fully shown, at the trial, insofar as it was pertinent to the matters placed in issue by the original parties' pleadings. No such necessity was shown with reference to the Regional Board and, in light of our modification of the judgment in deference to the Board, no such necessity may be shown now. The necessity of joining innumerable landowners was not established, and an order to that effect would have imposed unreasonable complications upon the resolution of the issues which were squarely before the trial court when the motion was made. (See *Leonard Corp.* v. *City of San Diego* (1962) 210 Cal.App.2d 547, 550-551 [26 Cal.Rptr. 730] and cases there cited.)

■ Indispensable parties are those without which a complete determination of a controversy may not be realized. (*Leonard Corp.* v. *City of San Diego, supra,* 210 Cal.App.2d 547 at p. 550.) The general rule of discretionary joinder prevails unless the record affirmatively discloses that proposed new parties are "indispensable" in this sense. (*First Nat. etc. Bk.* v. *Superior Court* (1942) 19 Cal.2d 409, 415 [121 P.2d 729]. See *City of Sacramento* v. *Superior Court* (1962) 205 Cal.App.2d 398, 400 [23 Cal.Rptr. 43].) The City's showing on its motion did not establish this.

The judgment is modified by striking the period at the end of paragraph 1(b) thereof and inserting in lieu thereof the following: "; provided, that defendant, its officers, council, agents and employees shall not be required to furnish sewer connections to plaintiff's properties in violation of any order of the State Water Resources Control Board or of the Regional Water Quality Control Board, San Francisco Bay Region. Defendants, its officers, council, agents and employees forthwith shall repair, rebuild, improve, maintain and operate defendant's sewer facilities and sewage treatment plant so as to satisfy the requirements and conditions of either Board, or of both, relative to the connection of plaintiff's properties thereto. Defendant, its officers, council, agents and

employees shall commence, file and thereafter diligently pursue all applications, reports, studies, plans and other proceedings, with and before either Board, which are desirable or necessary to accomplish the connection of plaintiff's properties to defendant's sewer facilities and sewage treatment plant. Nothing contained in this paragraph relieving defendant, its officers, council, agents and employees from furnishing sewer connections to plaintiff's properties in violation of any order of either of said Boards shall relieve defendant from its liability for daily monetary damages as ordered in paragraph 4 hereof."

As so modified, the judgment is affirmed. Respondent to recover costs on appeal.

Caldecott, P. J., and Emerson, J.,* concurred.

A petition for a rehearing was denied June 17, 1976, and appellant's petition for a hearing by the Supreme Court was denied August 4, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.