Filed 6/22/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DISCOVERY BUILDERS, INC., et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF OAKLAND et al.,<br><br>      Defendants and Appellants. | A164315<br><br>(Alameda County<br>Case No. RG20073110) |

In 2005, developers of The Monte Vista Villas, a large residential development project in Oakland ("the Project"), entered into an agreement with the City of Oakland ("the City") to pay certain fees to cover the costs of the City's project oversight.  The agreement provided that the fees set forth in the agreement satisfied "all of the Developer's obligations for fees due to the City for the Project."

In 2016, the City adopted ordinances which imposed new impact fees on development projects that were meant to address the effects of development on affordable housing, transportation, and capital improvements.  The City assessed the new impact fees on the Project, at that point more than a decade into development, when the developers sought new building permits.  The developers petitioned for a writ of mandate challenging imposition of the fees in light of the earlier agreement.  The trial court granted the writ, vacated imposition of the fees, and directed the City to refrain from assessing any fee not specified in the agreement.

1

We conclude that any provision in, or construction of, the parties' agreement that prevents the City from imposing the impact fees on the instant development project constitutes an impermissible infringement of the City's police power and is therefore invalid. Accordingly, we shall reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Project Overview

The Project, located at the site of the former Leona Quarry, has been in development since the early 2000s. The project's initial developers, the DeSilva Group and Leona, LLC, planned to close the 128-acre quarry site, reclaim it, and develop the land into a residential neighborhood with over 400 residential units (primarily townhomes and condominiums plus some single-family homes), a community center, a park, pedestrian trails, and other recreational areas. The Skyview Executive Homes ("Skyview"), a 60-unit condominium development housed in 10 separate buildings, is part of the Project. Sky Chi 8, LLC ("Sky Chi") is the current seller and owner of Skyview, and Discovery Builders, Inc. ("DBI") is Skyview's current developer and general contractor (Sky Chi and DBI are collectively referred to as "Respondents").

Between 2004 and 2005, the City approved the vesting tentative map for the Project, as well as final tract maps. The City's approval was subject to the terms of a 40-page document entitled "Conditions of Approval" ("COA") and the adoption of all the mitigation measures identified in the environmental review as set forth in the "Mitigation Monitoring and Reporting Program" ("MMRP").

The COA reflected the large scale, complexity, and phased schedule of the Project, which required a level of review beyond the City's standard practices for a development project. The Project required implementation of

2

dozens of mitigation measures to address the significant environmental impacts identified in the environmental review. These mitigation measures required numerous independent experts to monitor grading and construction activities including but not limited to biologists, geotechnical engineers, hydrologists, and air quality and noise monitors. Due to this additional oversight, the City required the developer to enter into a cost-allocation agreement with the City to fund the full costs incurred by the City in hiring and supervising all independent technical and other consultants needed for the Project.

## B. The 2005 Agreement

Accordingly, in the summer of 2005, the City entered into an agreement with the developers entitled "Agreement for Payment of City Fees and Reimbursement of Specialized Consultant and Employee Services" (the "2005 Agreement" or "Agreement"), which set the terms for compensating the City for employee services and outside consultants in compliance with the COA. Following a series of recitals concerning the Project's history and scope and the obligations set forth by the COA, the Agreement has 21 enumerated sections. Some relevant provisions are as follows:

Section 1 – "Payment of City Fees as Per Exhibit B and D" – provides that "the City and Developer tentatively agreed on the amount of the City Fees to be paid by Developer in connection with the Project (Exhibit D). The payment of the City Fees detailed in Exhibit B hereto . . . , along with such additional payments as called for in this Agreement, is agreed by the Parties to fully satisfy and discharge Developer's obligations for the City Fees and its obligations pursuant to [the COA]."

Section 2 – "Specialized Consultant Services" – identifies Exhibit C as the "best estimate" for "Specialized Consultant Services and Related Costs"

3

required for the Project.  The developer acknowledges that Exhibit C "represents . . . the best understanding of the parties of the estimated amount and type of Specialized Consultant Services that will be required to be hired by the City to satisfy its obligations under the COA and the MMRP in furtherance of the COA."

Section 7 – "Developer Obligations" – states in full: "The parties agree that except as expressly provided herein, the City Fees and other monies paid and to be paid by Developer which are referred to in this Agreement satisfy all of the Developer's obligations for fees due to the City for the Project (including without limitation all obligations of the Developer related to [the COA]), including plan check fees, permit fees, project management fees, construction management and inspection fees, grading fees, tentative map fees, and contract compliance fees as set forth in Exhibit B."

Section 16 – "Severability" – states that if one or more of its provisions are found to be "invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not, in any way, be affected or impaired."

Multiple exhibits are attached to the Agreement.  Exhibit A to the Agreement is the COA.  Exhibit B is a one-page document entitled "Estimate of City Fees," which categorizes the various "City Fees" into three categories: (1) building permit fees; (2) the City's Public Works Agency ("PWA") improvements and other fees; and (3) other project-related fees.  Exhibit C, a one-page document entitled "Estimated Costs for Specialized Services," contains a table listing three consultants and the estimated costs for each. Exhibit D, a three-page document entitled "Summary of City Fees and Payment Timelines as of April 19, 2005," lists the total developer cost obligation for each City Fee category (e.g., off-site sewer mitigation fees, final

4

map fees, grading permit fees, etc.), and details past payments and timelines for satisfying the remaining balances.

The Agreement was signed on behalf of the City by Claudia Cappio, the City's Director of Planning, Building and Major Projects.

### C.    Pre-Impact-Fee Development

Development of the Project began soon after the City approved it and has continued uninterrupted through the present day.  Between 2005 and 2015, the developer applied for and obtained from the City numerous building permits to support the initial phases of development.

In April 2016, Respondents applied for and obtained their first building permit for one of Skyview's 10 buildings.  In August 2016, they applied for and obtained another building permit for another Skyview building.

### D.    The New Impact Fees

On September 1, 2016, three new impact fees for development projects – an affordable housing impact fee, a transportation impact fee, and a capital improvements impact fee – adopted by the City in May 2016 took effect. (Oakland Municipal Code ("Oakland Mun. Code"), §§ 15.72 et seq., 15.74 et seq.)  The adopting ordinances noted the City's critical need to ensure that the impacts of new development on the need for affordable housing, transportation, and capital improvements (fire, library, parks and recreation, police, and storm drain) were addressed; the ordinances also noted that development impact fees were a commonly used mechanism to address such needs.  Thus, the affordable housing impact fee was established to "assure that market-rate residential developments projects pay their fair share to compensate for the increased demand for affordable housing generated by such development projects" within Oakland.  (*Id.*, § 15.72.010.)  Similarly, the transportation and capital improvements impact fees were established "to

5

assure that development projects pay their fair share to compensate for the increased demand for transportation and capital improvements infrastructure generated by such development projects" within Oakland. (*Id.*, § 15.74.010.)

The amount of each impact fee was determined by a study evaluating the degree of impact fairly attributable to that development and varies by location in the city and the type of development. (Oakland Mun. Code, §§ 15.72.020, 15.74.020, 15.72.060, 15.74.060.) For a given project, the total amount in impact fees owed is based on the impact fee amounts set forth in the Master Fee Schedule in effect upon submission of a complete building permit application. (*Id.*, §§ 15.72.050, 15.74.050.) All three impact fees are assessed "as a condition of the building permit." (*Id.*, §§ 15.72.040, 15.74.040.)

The developer of any project "for which a complete building permit application is submitted on or after September 1, 2016, must pay the impact fee in effect at the time of the building permit submittal." (Oakland Mun. Code, §§ 15.72.040, 15.74.040.) Any project for which a complete building permit application was submitted prior to September 1, 2016, is exempt from paying the impact fee as long as certain criteria are met. (*Id.*, §§ 15.72.040, 15.74.040.) Other exemptions also apply. Projects that "obtain[ed] a vested right, as defined by California law, no later than sixty (60) days after" the laws' adoption (or July 2, 2016), are exempt, as are certain developments, such as those that provide affordable housing on site. (*Id.*, §§ 15.72.040, 15.74.040.) After identifying these exemptions, the ordinances state that "[t]he impact fee and requirements authorized . . . are in addition to any other fees or mitigation measures otherwise authorized by law." (*Id.*, §§ 15.72.040, 15.74.040.)

### E. Development Following Effective Date of Impact Fees

Between October and December 2016 – after the impact fees took effect – Respondents filed building permit applications for five more of Skyview's 10 buildings. Even though these building permit applications were filed after the September 1, 2016 effective date for the new impact fees, permits for all five buildings were issued without any of the new impact fees being assessed or paid.

In August 2019 and December 2019, Respondents filed building permit applications for the three remaining Skyview buildings. For each of the three building permits, the City assessed all three impact fees. In total, the City assessed Respondents $432,000 in impact fees for the three buildings.

Respondents sent notices of protest to the Mayor and City Council objecting to the imposition of impact fees on the three buildings under a process established by the Mitigation Fee Act (Govt. Code, § 660202). As part of this process, they paid a portion of the impact fees assessed in order to secure the building permits, which the City issued between February and December 2020. They also expressed their intent to pay any outstanding balance due pending resolution of their protests.

In Respondents' protests, they asserted that the 2005 Agreement between the prior developer and the City barred the imposition of the impact fees. They argued that the City's 2005 approval of the vesting tentative map for the Project resulted in a statutory vested right to pay only "the impact fees in effect at that time." They also laid claim to a "common law vested right" by virtue of having obtained building permits and performed work on other buildings within the larger Project. Finally, in two of their protests, Respondents claimed the City "waived its ability to impose impact fees

through its unreasonable delay" and noted their reasonable and detrimental reliance on the City's conduct.

The City did not rescind the fees.

## F.     Petition for Writ of Mandate

In September 2020, Sky Chi and DBI filed a petition for writ of mandate challenging imposition of the impact fees and asserting many of the arguments in their notices of protest. Following full briefing and a hearing, the trial court granted the writ petition.

In its order, the court observed that Section 7 of the 2005 Agreement – under which the parties agreed that the "City Fees and other monies paid and to be paid by Developer which are referred to in [the] Agreement satisfy all of the Developer's obligations for fees due to the City for the Project" – reflected the City's agreement to limit the fees applied to the Project to only those identified in the Agreement. The court found the impact fees to be "building permit fees" under the 2005 Agreement, so that the Agreement's limits on fee obligations must govern. The court also noted that the "[i]mpact [f]ees were adopted in 2016, and nothing in the 2005 Agreement authorize[d] the City to impose new fees such as the [i]mpact [f]ees." Therefore, the court concluded Sky Chi and DBI maintained "a contractual right not to pay the Impact Fees [and that] [t]he City's requirement of payment of the Impact Fees on [Sky Chi and DBI], as a condition of issuance of building permits at Skyview, breached the 2005 Fee Agreement."

In addressing the City's argument that enforcing the 2005 Agreement to preclude imposition of the impact fees infringed upon the City's police power, the court stated: "The Court does not find that enforcement of this contract constitutes infringement of [the City's] police power, and does find the City is estopped from challenging this contract's enforceability after 16

8

years of having the contract in place and both parties relying upon and complying with the contract. In this narrow instance, the making of a contract between [the developers] and the City providing that [the developers] would pay certain building permit fees, plus annual increases, but not any new fees, does not impede the City's ability to impose new exactions on developers more generally. This is not an illegal contract that can be avoided."

The court also rejected Sky Chi and DBI's argument that the impact fees were precluded on the independent grounds that they maintained a common law vested right and a statutory vested right based on the City's issuance of a continual series of building permits for the Project and its approval of a vesting tentative map.

In November 2021, the trial court issued the writ of mandate ordering the City to vacate imposition of impact fees upon Sky Chi and DBI and to refund impact fees already paid with interest. The writ commanded the City to abide by the "express language of the 2005 Fee Agreement" and noted the City "may not assess any fees not specified in the 2005 Fee Agreement, including the Impact Fees." The court granted judgment in favor of Respondents. This appeal by the City followed. On appeal, the City contends the trial court erred because: (1) the agreement does not prohibit the assessment of impact fees enacted after the agreement was signed; (2) the trial court's construction of the agreement infringed upon the City's exercise of its police power; and (3) the doctrine of equitable estoppel did not prohibit the City from exercising its police power.

DISCUSSION

## A. Standard of Review

Sky Chi and DBI filed a petition for writ of traditional mandamus pursuant to Code of Civil Procedure section 1085. A writ of traditional mandamus may be used to compel the performance of a duty that is purely ministerial in nature or to correct an abuse of discretion. (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547–548.) "In traditional mandamus actions, the agency's action must be upheld upon review unless it constitutes an abuse of discretion." (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 585 (*O.W.L. Foundation*).)

" 'In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support.' " (*O.W.L. Foundation, supra*, 168 Cal.App.4th at p. 586; *Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 795 ["In a traditional mandamus proceeding, the question of abuse of discretion turns not on whether the agency's findings are supported by substantial evidence . . . but whether the agency's action was arbitrary and capricious."].) " '[B]ecause "trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo." ' " (*O.W.L. Foundation*, at p. 586.)

## B. Interpreting the 2005 Agreement

The City argues that the 2005 Agreement was never intended to cover the later-enacted impact fees, and does not prohibit the assessment of such fees against Respondents. According to the City, the Agreement was intended only to cover the costs of City employee services and specialized consultant fees, and the impact fees fall outside of these categories.

10

Respondents, on the other hand, argue that the Agreement's plain language precludes the imposition of the impact fees. They contend that the language in section 1 – which provides that the payment of the City Fees detailed in Exhibit B plus "such additional payments as called for in [the] Agreement" fully satisfy and discharge the developer's obligations – clearly and unambiguously establishes that the 2005 Agreement encompasses all fees Respondents are obligated to pay the City for the Project. In their view, section 7 further reinforces the parties' intent that the payment of the fees expressly set forth in the Agreement would satisfy all of the developer obligations for fees due to the City for the Project.

We find that, even if Respondents' interpretation of the Agreement were correct, any provisions in the Agreement that bar the City from imposing its new impact fees on the Project are untenable and cannot be enforced. That is because any such provisions would be an invalid infringement on the City's police power, as discussed below.

### C. The City's Police Power

The City contends the trial court's construction of the 2005 Agreement was erroneous because it "fail[ed] to interpret the Agreement in light of the City's inherent authority to exercise its police power." The City asserts that "[a]ny element of the 2005 Agreement intended to contract away the City's right to impose impact fees would be void from the outset." We agree.

The California Constitution provides that a county or city may make and enforce within its limits "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, §7.) From this police power, a California city derives its power to control land use and enact comprehensive land use and zoning laws. (*Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 708–709; *Summit*

11

*Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 934 (*Summit Media*) ["[L]and use regulations involve the exercise of police power."].) Development fees are an exercise of this police power. (*California Bldg. Industry Assn. v. Governing Bd.* (1988) 206 Cal.App.3d 212, 234–235.)

It is also well-established that " 'the government may not contract away its right to exercise the police power in the future.' " (*Summit Media, supra,* 211 Cal.App.4th at p. 934.) " '[A] municipality may not "contract away" its legislative and governmental functions.' " (*County Mobilehome Positive Action Committee v. County of San Diego* (1998) 62 Cal.App.4th 727, 736 (*County Mobilehome*); *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 (*Delucchi*) [" ' " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' " ' "].) Any agreement that contracts away these functions is invalid and unenforceable as contrary to public policy. (*County Mobilehome,* at p. 736; *Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 (*Morrison Homes*) ["The effect of the rule, however, is to void only a contract which amounts to a city's 'surrender,' or 'abnegation,' of its *control* of a properly municipal function"].)

Here, there appears to be no disagreement that the new impact fees reflect an exercise of the City's police power. The parties, however, dispute whether enforcement of the 2005 Agreement in a manner that bars the City from imposing those fees on Skyview infringes on that power. The following cases are instructive.

In *Avco Community Developers, Inc. v. South Coast Regional Commission* (1976) 17 Cal.3d 785 (*Avco*), a new land use requirement (a permit from the coastal zone commission) was enacted before the developer

12

had obtained a building permit for a project, but after the developer had performed pre-permit construction work. (*Id.* at pp. 788–790.) Our Supreme Court rejected the developer's argument that it did not need to comply with the new requirement because it had a common-law vested right to develop land based on the regulations in effect when certain subdivision and grading improvements on the property were authorized. (*Id.* at pp. 791–800.) The developer also argued that, even if it did not maintain a vested right, its agreement to sell certain property to the Orange County Harbor District in exchange for a commitment by the county and state that it would be permitted to carry out its project in accordance with the planned community zoning estopped enforcement of the new permit requirement. (*Id.* at pp. 799–800.) In rejecting this argument, the Supreme Court agreed with the trial court that the state's police power "over[rode] any obligation of the state to perform" the contract. (*Id.* at p. 800.) It found that an agreement to exempt the developer from future land use regulation "would be invalid and unenforceable as contrary to public policy," because "it is settled that the government may not contract away its right to exercise the police power in the future." (*Ibid.*) Further, "even upon the dubious assumption that the [agreement] constituted a promise by the government that zoning laws thereafter enacted would not be applicable to [the project], the agreement would be invalid and unenforceable as contrary to public policy." (*Ibid.*)

In *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716 (*Alameda County Land Use*), three governmental entities entered into a memorandum of understanding concerning approximately 13,000 acres of open space in which they agreed to use their "best efforts" to adopt certain specified goals and policies into their respective general plans concerning the open space. (*Id.* at pp. 1719–1720.) They also

13

agreed that if all three entities adopted certain land use policies in their general plans, then any future attempt to amend those policies would not be effective unless the other two entities enacted parallel amendments to their general plans.  (*Id*. at p. 1720.)  Relying on the rule that a local government may not contract away its right to exercise its police power in the future, the court found their agreement invalid: "Respondents' agreement . . .  that their individual general plan amendments are ineffective unless like amendments are made to the other jurisdictions' general plans is a surrender of each respondent's power to amend its own general plan.  This policy divests each respondent, presently and in the future, of its sole and independent authority to amend its respective general plan, by providing outside jurisdictions a veto over such amendments."  (*Id*. at p. 1724.)  The court further noted that the agreement "constitutes an impermissible divestment by respondents of their power and obligation to enact legislation affecting the lands within their respective jurisdictions."  (*Id*. at p. 1725.)

These authorities make clear that any agreement that functions to divest a municipality of its ability to exercise its police power with respect to land use laws is invalid.  (See also *Delucchi*, *supra*, 179 Cal.App.3d at p. 823 [" ' " 'the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals . . .  cannot be nullified in advance by making contracts inconsistent with its enforcement' " ' "].)  As noted, there is no dispute that the City's affordable housing, transportation, and capital improvements impact fee ordinances that took effect in 2016 arose from the City's police powers.  Thus, any provision in the 2005 Agreement that infringes upon the exercise of the City's police power to enact or enforce land use ordinances to protect public health and safety within its jurisdiction cannot be enforced.  Likewise, any provision in or construction of

14

the Agreement that prevents the City from imposing those impact fees on Respondents' development infringes on the City's police power and simply cannot be enforced.

In reaching this conclusion, we also apply the bedrock principle that a contract must, if possible, be interpreted to make it "lawful, operative, definite, reasonable, and capable of being carried into effect." (Civ. Code, § 1643.) We recognize that " 'California cases take a very liberal view of severability, enforcing valid parts of an apparently indivisible contract where the interests of justice or the policy of the law would be furthered.' [Citation.] Severance is favored in order 'to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract.' " (*Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 56.) In light of the severance clause in section 16 of the Agreement which states that if one or more of its provisions are found to be "invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not, in any way, be affected or impaired," any provision of the Agreement that prohibits or is interpreted to prohibit the City from enforcing the impact fees must be stricken while the other provisions remain.

While Respondents readily acknowledge that a city cannot contract away its police power, they argue that the 2005 Agreement "does not impermissibly surrender or abnegate the City's police powers." They claim that "the City can continue to comply with the Agreement without now surrendering police power." Respondents further add that the Agreement "ha[d] no impact on the City's ability to legislate" because "the City retained

15

control of the Project from 2005 on and never surrendered its power to make or enforce future zoning laws or impose new exactions on other developers."

The notion that the City's police power is neither surrendered nor abnegated because the City can still legislate is shortsighted. This argument suggests that a city's police power is concerned only with the power to enact laws, not the power to enforce laws. However, our constitution plainly establishes that "[a] county or city may make *and enforce* within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7, emphasis added.) Indeed, a city's authority to make laws would be fictional if not accompanied by the power to enforce or impose those laws.

Respondents' related argument that there is no surrender of police powers because the City still maintains the power to make and enforce future zoning laws on other developers – a position endorsed by the trial court – is also misplaced. Respondents cite no authority that allows for the selective enforcement or application of land use regulations by contract. Further, courts have invalidated agreements exempting a small subset of parties from laws and ordinances. (See, e.g., *Summit Media*, *supra*, 211 Cal.App.4th at p. 937 [concluding an agreement is invalid "when it contractually exempts settling parties from ordinances and regulations that apply to everyone else and would, except for the agreement, apply to the settling parties"].) We cannot disregard the infringement on the City's police power simply because of its ongoing ability to impose land use ordinances on others.

Respondents' reliance on *Morrison Homes*, *supra*, 58 Cal.App.3d 724, and *108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186 (*108 Holdings*), is also unavailing, as both cases are distinguishable.

16

In *Morrison Homes*, 58 Cal.App.3d 724, which predates *Avco*, the city of Pleasanton entered into a series of written contracts with a developer under which the city agreed to annex certain lands and to provide sewer services to homes built on the annexed lands. (*Id.* at pp. 729–730.) Later, Regional Water Quality Control Board orders relating to violation of its waste discharge standards in connection with the city's sewage treatment plant prevented the city from making new sewer connections to the annexed tracts. (*Id.* at pp. 731–732.) The developer sued, seeking a declaration that the city's sewer commitment was a binding and enforceable obligation the city had to perform. (*Id.* at p. 732.) The court rejected the city's argument that the contracts were invalid attempts to contract away its legislative and governmental functions and thus unenforceable because there was no provision in the contracts that involved a surrender by the city of its control of the annexation process or its sewer operations. (*Id.* at pp. 733–734.)

In *108 Holdings, supra*, 136 Cal.App.4th 186, the city of Rohnert Park entered into a settlement agreement and stipulated judgment (collectively, "the agreement") with a third party to resolve a lawsuit brought by the third party challenging the city's adoption of its General Plan. (*Id.* at p. 189.) Under the agreement, the city agreed to apply to the local agency formation commission to amend its sphere of influence[1] and to apply certain policies regarding groundwater, community design, and traffic to development projects as set forth in the agreement. (*Id.* at pp. 190–191.) Following a public hearing, the city amended its sphere of influence, thereby removing

[1]     " 'Sphere of influence' means a plan for the probable physical boundaries and service area of a local agency, as determined by the [local agency formation] commission." (Govt. Code, § 56076.) It is a " 'prospective measure, charting what a city's or district's boundaries might be at some future point.' " (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1325, fn. 3.)

17

certain lands from its sphere. (*Id.* at p. 191.) The plaintiffs – owners of property removed from the city's sphere of influence – sued the city on the basis that it improperly surrendered its police power by entering into the agreement. (*Id.* at pp. 191–192, 194.) The court concluded there was no abnegation. (*Id.* at pp. 195–196.) After observing there was no prohibition barring the city from resolving land use litigation by agreement, the court noted that there was no provision in the agreement that limited the city's ability to later amend its General Plan should future events so require. (*Id.* at pp. 195–197.) In a close review of the agreement, the court further observed that its provisions did no more than carry out policies already established in the city's General Plan. (*Id.* at pp. 198–202.)

Both *Morrison Homes* and *108 Holdings* recognize that a city can carry out municipal functions by contract, and such contracts are valid and enforceable provided they apply existing law or carry out existing policies. However, neither case involved a contractual prohibition that purportedly exempted select parties from compliance with generally applicable land use ordinances. As such, they do not compel a different result.

Finally, we reject Respondents' assertion that *Avco*, *supra*, 17 Cal.3d 785, is irrelevant to the issues in this appeal because they have not challenged the trial court's conclusion that they held no vested rights in the Project, and because its holding on the contractual issue is *dicta*. While the majority of the *Avco* opinion focuses on the court's vested rights analysis, which is inapposite to the case before us, we disagree that the Supreme Court's contractual analysis constitutes *dicta*. Broadly, the Supreme Court explained at the outset of its opinion: "We are confronted with the apparently irreconcilable conflict between the interests of a land developer who seeks to avoid compliance with a recently enacted law regulating its project, and the

18

interests of the public in assuring development of the property in a manner consistent with the requirements of current law." (*Id.* at p. 788.) To avoid compliance with the newly enacted permit requirement, the developer contended that even if it did not have a vested right to build, it should still be able to proceed with construction based in part on a contract it had entered that purportedly committed the state to that course of action. (*Id.* at p. 799.) The Supreme Court's ruling that any agreement promising that zoning laws would not apply to certain lands would be invalid was therefore a necessary part of its decision, not dicta. (*Id.* at p. 800.)

### D. Equitable Estoppel

Respondents contend the City is estopped from arguing the 2005 Agreement is unenforceable after more than 16 years of enjoying the benefits of the Agreement. We disagree both because Respondents have waived this argument and on the merits.

"The principle of estoppel . . . prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer incurs substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive the developer of the right to complete the development as proposed. [Citation.] The theory of equitable estoppel simply recognizes that, at some point in the development process, a developer's financial expenditures in good faith reliance on the governmental entity's land use and project approvals should estop that governmental entity from changing those rules to prevent completion of the project." (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 (*Toigo*).)

"The elements of equitable estoppel are '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be

19

acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 (*Schafer*).) "An additional requirement applies in cases involving equitable estoppel against the government. In such a case, the court must weigh the policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest." (*Ibid.*) "Even if the four elements of equitable estoppel are satisfied, the doctrine is inapplicable if the court determines that the avoidance of injustice in the particular case does not justify the adverse impact on public policy or the public interest." (*Ibid.*)

"The existence of equitable estoppel generally is a factual question for the trier of fact to decide, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law. [Citations.] We review factual findings regarding the existence of equitable estoppel under the substantial evidence test. [Citation.] In a case involving equitable estoppel against the government, however, the existence of estoppel is in part a legal question to the extent it involves weighing policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. [Citations.] . . . . [W]e review questions of law de novo." (*Schafer, supra,* 237 Cal.App.4th at pp. 1263–1264.)

Respondents' estoppel argument has been waived. "It is axiomatic that arguments not asserted [in the trial court] are waived and will not be considered for the first time on appeal." (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3; *Newton v. Clemons* (2003) 110

Cal.App.4th 1, 11 [reviewing court will not ordinarily consider claims, arguments, authority and facts presented for the first time on appeal that could have been but were not presented to the trial court].) Similarly, " '[a]s a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' " (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344.) Respondents never argued equitable estoppel in the trial court and are thus precluded from doing so for the first time here.

Nonetheless, we recognize estoppel was one of the grounds for the trial court's decision and thus shall address estoppel briefly on the merits. Even if Respondents had argued equitable estoppel in the trial court, we would not be persuaded the doctrine applies under the circumstances before us.

Assuming without deciding that Respondents could satisfy the four requisite elements of estoppel, we cannot conclude that in this particular instance there is any grave injustice to Respondents that outweighs the adverse impacts on public policy or the public interest. Respondents face "daunting odds in establishing estoppel against a governmental entity in a land use case. Courts have severely limited the application of estoppel in this context by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern 'is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits.' [Citation.] Accordingly, estoppel can be invoked in the land use

21

context in only " 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' " (*Toigo*, *supra*, 70 Cal.App.4th at p. 321.)

Respondents have not persuaded us that this is such an extraordinary case. They argue that it would be unjust to require them to pay the new impact fees because they have already made contributions towards alternative affordable senior housing and towards traffic and capital improvements, recreation space, and open space, which have already been constructed per the Agreement. In their view, the injustice in allowing the City "to double-dip" by imposing both the mitigation measures in the Agreement and impact fees outweighs "any minimal public interest concern" over the new impact fees.

Respondents have not reconciled their argument with or addressed provisions in the ordinances which allow the impact fees to be assessed on top of other mitigation measures. (See Oakland Mun. Code, §15.72.040 ["The impact fee and requirements authorized by this Chapter are in addition to any other fees or mitigation measures otherwise authorized by law."], *id*., § 15.74.050 [same].) Even if their "double-dipping" argument were tenable despite such provisions, Respondents have not established that the mitigation measures they paid for and the impact fees they were assessed are identical, or even overlap. And in other contexts, we have expressed skepticism of claims that a purely economic hardship is an "extraordinary case where the injustice is great," meriting estoppel. (See *Schafer*, *supra*, 237 Cal.App.4th at pp. 1264–1265 [collecting cases denying estoppel even under circumstances of severe financial hardship].) Simply put, any of Respondents' proffered injustices do not outweigh the public's strong and

22

vital interest in the enforcement of the land use laws enacted by its elected representatives.  (See *id.* at p. 1265.)[2]

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter a new judgment denying the petition for writ of mandate.  The parties are to bear their own costs on appeal.

---

[2]     In light of this conclusion, we do not address whether the trial court's finding that Respondents did not have a vested right to be free of the new impact fees – which Respondents have not challenged – means there can be no estoppel.

23

 

                       _____

                       Petrou, J.

WE CONCUR:

_____

Tucher, P.J.

_____

Rodríguez, J.

A164315/*Discovery Builders, Inc. et al., v. City of Oakland et al.*

24

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Frank Roesch

Counsel: Law Office/Firm, Attorney Name, Farella Braun + Martel, James H. Colopy, Carly O. Alameda, and Jennifer Bentley, for Plaintiffs and Respondents.

City of Oakland, Allison Ehlert, Barbara J. Parker, Maria Bee, and Cynthia Stein, for Defendants and Appellants.